UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GAIL HELIJAS, as Administratrix of the Estate of
Lucky Lee Wilkins, Jr.,

               Plaintiff,              1:15-CV-1049
                                    (GTS/DJS)

v.

CORR. MED. CARE, INC.; EMRE UMAR;
MARIA CARPIO; SUSAN MORGAN;
SCHENECTADY CTY.; DOMINIC D'AGOSTINO;
JIM BARRETT; JOHN DOES NO. 4-5, employees of
Ellis Hospital whose identities cannot presently be
determined; CARLOS VALLE; and JANE DOE
NO. 1, an employee of Corr. Med. Care, Inc.,
whose identity cannot presently be determined,

               Defendants.
_____

APPEARANCES:                            OF COUNSEL:

LAW OFFICES OF ELMER R. KEACH, III, P.C.    ELMER R. KEACH, III, ESQ.
  Counsel for Plaintiff                      MARIA K. DYSON, ESQ.
One Pine West Plaza, Suite 109
Albany, New York 12205

STEWART BERNSTIEL REBAR & SMITH       CATHLEEN KELLY REBAR, ESQ.
  Counsel for Defendants Corr. Med.         VINCENT CHIRICO, ESQ.
  Care, Inc., Emre Umar, Maria Carpio,
  and Susan Morgan
Time & Life Building
1271 Avenue of the Americas, Suite 4300
New York, New York 10020

GOLDBERG SEGALLA LLP               JONATHAN BERNSTEIN, ESQ.
  Counsel for Defendants Schenectady
  County, Dominic D'Agostino, and Jim
  Barrett
8 Southwoods Boulevard, Suite 300
Albany, New York 12211

O'CONNOR, O'CONNOR, BRESEE & FIRST, P.C.     DENNIS A. FIRST, ESQ.
  Counsel for Defendant Carlos Valle       STEVEN V. DeBRACCIO, ESQ.
20 Corporate Wood Boulevard
Albany, New York 12211

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this prisoner civil rights action filed by Gail Helijas as administratrix of the estate of Lucky Lee Wilkins, Jr. ("Plaintiff") against the eleven above-named entities and individuals (collectively, "Defendants") pursuant to 42 U.S.C. § 1983, are the following three motions: (1) a motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, to strike certain paragraphs thereof, pursuant to Fed. R. Civ. P. 12(f), filed by Defendants Correctional Medical Care, Inc., Emre Umar, Maria Carpio, and Susan Morgan (sometimes "CMC Defendants") (Dkt. No. 16); (2) a motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), filed by Defendant Carlos Valle (Dkt. No. 83); and (3) a motion to dismiss cross-claims asserted by Defendants Schenectady County, Dominic D'Agostino, and Jim Barrett, filed by Defendant Carlos Valle (Dkt. No. 97).  For the reasons set forth below, CMC Defendants' motion is granted in part and denied in part; Defendant Valle's motion to dismiss Plaintiff's Complaint is granted in part and denied in part; and Defendant Valle's motion to dismiss the cross-claims asserted against him is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Second Amended Complaint[1]

Generally, in her Second Amended Complaint, Plaintiff alleges as follows. (Dkt. No. 75 [Plf.'s Second Am. Compl.].)

#### 1. Medical Care and Death of Plaintiff's Decedent, Lucky Lee Wilkins, Jr.

On Friday, May 16, 2014, while being held at the Schenectady County Jail "(the Jail")," Lucky Lee Wilkins, Jr. ("Wilkins"), Plaintiff's decedent and son, filled out a sick call slip. (*Id.* at ¶¶ 15, 17.) Plaintiff noted in his sick call slip that he was having "'really bad' anxiety and panic attacks," that he was "depressed, was having trouble sleeping, and was feeling tired and weak." (*Id.* at ¶ 17.) Generally, during the course of his detainment, Wilkins exhibited symptoms of severe depression, including suicidal ideation, but did not "receive[] appropriate medical treatment" in light of those symptoms. (*Id.* at ¶ 16.)

On Monday, May 19, 2014, Wilkins' sick call slip was triaged by Defendant Jane Doe No. 1, who evaluated Plaintiff and determined that "he was in need of emergent medical treatment." (*Id.* at ¶ 18.) Despite Wilkins' "obvious signs of depression and suicidal observation," however, Jane Doe No. 1 merely "placed [Wilkins] on a wait list to be seen by a mental health provider." (*Id.*)

---

[1]       Two notes about this pleading are in order. First, although Plaintiff's current operative pleading is captioned "Plaintiff's First Amended Complaint," Plaintiff's actual First Amended Complaint was filed without objection on December 28, 2015. (Dkt. No. 18.) As a result, the Court will refer to Plaintiff's operative pleading (which was filed with the consent of the parties and with the leave of the Court on April 29, 2016) as the "Second Amended Complaint." (Dkt. No. 75.) Second, Plaintiff's Second Amended Complaint refers to attached exhibits; those exhibits were filed with Plaintiff's original Complaint, but were not filed with Plaintiff's Second Amended Complaint. For purposes of this Decision and Order, the Court cites the exhibits attached to Plaintiff's original Complaint. (Dkt. No. 1.) Page citations to these exhibits refer to the pagination generated by CM/ECF, the Court's electronic filing system.

On May 20, 2014, Wilkins was evaluated by Defendant Susan Morgan ("Morgan"), a licensed clinical social worker employed by Defendant Correctional Medical Care, Inc. ("CMC"). (*Id.* at ¶ 19.) Morgan observed that Wilkins was "experiencing severe symptoms of mental and physiological distress" and concerned about "several significant" personal issues, including "his criminal case, his wife's health, and his children." (*Id.*) Moreover, Wilkins exhibited "shortness of breath, rapid speech, anxious motor activity, an inability to sit still, heart palpitations when panicking, and anxiety." (*Id.*) Morgan noted in Wilkins' medical records that Wilkins "appeared overly anxious, afraid, or angry during his evaluation." (*Id.*) Wilkins informed Morgan that he had "a history of mental health issues," including "a prior involuntary commitment to a mental health hospital, a history of panic attacks and depression that had intensified during his detention at the jail." (*Id.*)

Despite Wilkins' complaints and Morgan's observations, Morgan did not refer Wilkins to a hospital or to be seen by a psychiatrist or psychologist, did not prescribe medication "to treat his emergent symptoms," and failed to ensure that Wilkins was "placed under any kind of mental health supervision," in violation of Schenectady County Jail's policies and procedures. (*Id.* at ¶ 20.) Rather, Morgan did only three things: (1) conducted a "brief" mental health screening and assessment; (2) gave Wilkins "literature that discussed" relaxation techniques and strategies for coping with anxiety; and (3) placed Wilkins on a "wait list" to see Defendant Dr. Carlos Valle ("Dr. Valle"), who was employed by CMC and was "the doctor responsible for providing mental health treatment at the jail." (*Id.* at ¶¶ 20-21.) Although Morgan placed Wilkins on a wait list to see Dr. Valle, Morgan "failed to inform Dr. Valle of the emergent nature of Wilkin[s'] symptoms," or, "[a]lternatively," Morgan *did* inform Dr. Valle of Wilkins' symptoms, and "Dr. Valle failed to take action." (*Id.* at ¶ 21.)

In addition to the complaints Wilkins conveyed in his sick call slip and to medical staff, as well as the symptoms with which he presented, other detainees at the Jail "also reported that [Wilkins] was severely depressed," threatened to commit suicide on multiple occasions, and "was being denied medical treatment."  (*Id.* at ¶ 22.)  One detainee "observed [Wilkins] try to scratch a tattoo . . . off of his neck," and others observed that he was "overly distressed about his personal relationship" and was denied medical care because the medical staff "thought he was 'faking' his condition."  (*Id.*)

On May 28, 2014, before he was evaluated by Dr. Valle or seen again by any other medical staff at the Jail, Wilkins committed suicide.  (*Id.* at ¶¶ 15, 21.)

### 2.    Role of Correctional Medical Care, Inc.

CMC, a private corporation, together with its president, Emre Umar ("Umar"), and owner, Maria Carpio ("Carpio"), have "engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various" county correctional facilities for which they have contracted to provide services, "as well as inadequate medical and mental health care in general."  (*Id.* at ¶ 25.)  CMC provides inadequate care as a cost-saving measure and to enhance the profitability of its contracts with local municipalities.  (*Id.*)  The New York State Commission of Correction has repeatedly "found deficiencies in staffing and care of detainees" at other New York State county jails at which CMC provides such services, resulting in detainee suicides committed at Tioga County Jail and Dutchess County Jail, and two suicides committed at Ulster County Jail.[2]  (*Id.* at ¶ 26.)  Moreover, the New York State Office of

---

[2]    According to an exhibit attached to Plaintiff's Complaint, one of the deaths investigated by the Commission of Correction was that of Latisha Mason, who died in February 2011 while detained at the Schenectady County Jail "from complications that developed from undetermined causes[.]"  (Dkt. No. 1 at 21 ["Exhibit B," Final Report in the Matter of the Death

the Attorney General ("OAG") has investigated CMC and, following that investigation, CMC

executed an "Assurance of Discontinuance."  (*Id.* at ¶ 28; *accord*, Dkt. No. 1 at 36-63.)[3]

of Latisha Mason].)  According to the report, Mason "had an acute psychosis due to PCP use that required extraordinary mental health management" and was in such a state "as to be unmanageable in jail."  (*Id.*)  The Commission of Correction found that her death was "precipitated by inadequate psychiatric and medical care by Ellis Hospital," to which she had been transported following her arrest and from which she was apparently released to the Jail. (*Id.*; *id.* at 25 ["The baseless discharge from Ellis Hospital of a combative, uncommunicative, intoxicated patient with frank psychotic symptoms without an adequate discharge plan to a facility manifestly incapable of caring for her represents grossly and flagrantly inadequate medical care by Ellis Hospital."].)  Ultimately, a Schenectady County Sheriff's Department officer was terminated from employment for failing to "respond to Mason's medical emergency," and the Commission of Correction recommended that CMC "shall assure that facility medical staff comply with" its policy of conducting a "Receiving Screening" and 9 N.Y.C.R.R. § 7010.2(d), which requires that any "inmate" who "still appears to be intoxicated by alcohol or drugs" twelve hours after admission "shall be immediately examined by a physician."

[3]          The Assurance of Discontinuance (which was executed by the OAG on September 22, 2014) reflects as follows.  From 2009 to 2012, six deaths occurred at five county jails that had contracted with CMC for the provision of health services.  (Dkt. No. 1 at 38 ¶ 7.) Investigations of the deaths, undertaken by the New York State Commission of Correction's Medical Review Board ("CCMRB"), "revealed that there were egregious lapses in medical care with respect to each of the deaths."  (*Id.*)  Its investigation into one such death, in Tioga County in October 2011, revealed "suicide by hanging following CMC's failure to provide appropriate medical and mental health care[ and] mental health care provided by an unlicensed provider." (*Id.*)  Based on the "serious deficiencies and illegalities" revealed by its investigations (including "unlicensed and inexperienced staff[,] inadequate staffing[,] lack of adequate medical oversight[,] and failure to adhere to medical and administrative protocols and procedures[,]" CCMRB and the New York State Education Department requested that OAG investigate CMC's conduct statewide.  (*Id.* at ¶¶ 11-12.)

OAG's investigation focused on CMC's provision of contracted-for medical services in the "jail systems" of Monroe County and Tioga County, and "examined CMC's corporate structure, together with its performance pursuant to its contracts," including time records, staffing credentials, policies, and procedures.  (*Id.* at ¶ 13.)  Following its investigation, OAG concluded, *inter alia*, that CMC (1) unlawfully engaged in the corporate practice of medicine, (2) failed to provide proper medical oversight to Tioga County's jail population, including on-site physician coverage for the number of hours required by its contract, (3) employed an unlicensed Director of Forensic Medicine at the Tioga County Jail, and (4) failed to maintain complete and accurate time records for its Tioga County Jail staff, and failed to employ "nursing personnel with the requisite experience" and "maintain adequate staffing" at "the Monroe Jail/Facility."  (*Id.* at ¶¶ 51-56.)

As part of the Assurance of Discontinuance, CMC agreed to, *inter alia*, restructure its business operations, employ an independent contract monitor to ensure CMC's compliance with its contracts, pay $100,000 in restitution to Tioga County, and pay a civil

["Exhibit D," Assurance of Discontinuance].)

CMC is also currently "on probation with" the National Commission of Correctional Health Care, which "regulates the quality of health services provided in correctional facilities." (Dkt. No. 75 at ¶ 33.)  This fact was known to Defendants Dominic D'Agostino ("D'Agostino") and Jim Barrett ("Barrett"), the Sheriff of Schenectady County and Jail Administrator of the Schenectady County Jail, respectively.[4]  (*Id.*)  Moreover, fines imposed against CMC (with respect to its contract with Schenectady County for unspecified reasons), which should have been paid to the County Executive or other appropriate authority, were actually paid to D'Agostino.  (*Id.* at ¶ 31.)  This payment, in addition to "the thousands of dollars receive[d] by D'Agostino in campaign contributions, provides a clear financial incentive for him to look the other way while his inmates die and suffer egregious injuries at his facility."  (*Id.*)

### 3.  Claims Arising from These Allegations

Based upon these factual allegations, Plaintiff asserts the following four claims: (1) a claim that all Defendants were deliberately indifferent to Wilkins' serious medical needs by willfully denying medical treatment to a detainee with serious medical needs as either medical staff members or policy makers,, in violation of the Eighth Amendment of the United States Constitution as well as 42 U.S.C. § 1983 ("First Cause of Action"); (2) a claim that CMC, Umar, Carpio, Valle, D'Agostino, and Barrett were deliberately indifferent to Wilkins' serious medical needs by implementing a municipal policy or practice "of not providing appropriate medical care

---

penalty of $100,000 to the OAG.  (*Id.* at ¶¶ 58-70.)  The Assurance of Discontinuance does not refer to any investigation, incident, or alleged wrongdoing with respect to CMC's provision of medical services in Schenectady County.  Notably, the Assurance of Discontinuance provides that it is "not intended for use by any third party in any other proceeding and is not intended, and should not be construed, as an admission of liability by CMC."  (*Id.* at ¶ 74.)

[4]       Where practical, the Court refers to Defendants Schenectady County, D'Agostino, and Barrett as "County Defendants."

to detainees at the Schenectady County Jail," as well as "many other local jails across the State" ("Section Cause of Action"); (3) a claim for conscious pain and suffering and loss of companionship, inflicted on Wilkins' two children ("Third Cause of Action"); and (4) a claim for wrongful death under New York State law, due to Defendants failure "to timely and appropriately treat" Wilkins in light of his "severe mental health symptoms" ("Fourth Cause of Action").[5] (*Id.* at ¶¶ 38-57.)

Familiarity with the factual allegations supporting Plaintiff's claims is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### B.     County Defendants' Cross-Claims

On May 26, 2016, County Defendants filed an Answer, in which they (among other things) denied Plaintiff's substantive allegations and asserted cross-claims for (1) common law contribution and indemnification, (2) breach of contract (as against CMC only),[6] and (3) contractual indemnification (as against CMC and Umar). (Dkt. No. 82 at ¶¶ 64-68 [County Defs.' Answer].)

---

[5]     The Court addresses its construction of Plaintiff's Second Amended Complaint in greater detail *infra*, in Part III.A of this Decision and Order.

[6]     More specifically, County Defendants allege that, if Plaintiff "recovers any Judgment against" them, this recovery will have been the result of CMC's failure to acquire professional liability, general liability, and personal injury insurance policies naming County Defendants as additional insureds, as agreed to in the Health Services Agreement between CMC, Schenectady County, and Sheriff D'Agostino. (Dkt. No. 82 at ¶ 65-66.)

**C.      Parties' Briefing of the Pending Motions**

      **1.      CMC Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint[7]**

          **a.      CMC Defendants' Memorandum of Law**

Generally, in support of their motion to dismiss Plaintiffs' Second Amended Complaint, CMC Defendants assert five arguments: (1) Plaintiff's deliberate indifference claim must be dismissed because she has failed to allege facts plausibly suggesting that (a) Wilkins' condition (or its seriousness) was communicated to CMC Defendants, and (b) CMC Defendants' actions or failure to act shocked the conscience or was "barbaric" in nature (Dkt. No. 16 at 10-13 [CMC Defs.' Memo. of Law]); (2) Plaintiffs' "Second Cause of Action" must be dismissed because (a) she has failed to allege facts plausibly suggesting a "tangible connection between" Wilkins' death and the individual CMC Defendants' actions or inactions, (b) the allegations in her Complaint concerning Defendants' "past issues with patient care . . . focus on a general pattern and practice of negligence by Defendants, rather than a pattern and practice specific to" Wilkins, and (c) she has failed to allege facts plausibly suggesting that Umar was personally involved in the constitutional violations that Wilkins suffered (*id.* at 13-14); (3) Plaintiff's "Third Cause of Action" must be dismissed because (a) she has failed to allege facts plausibly suggesting that Wilkins' children are entitled to damages for loss of companionship, and (b) she has failed to allege facts plausibly suggesting (i) the state law theory of liability pursuant to which he is

---

[7]      The CMC Defendants' motion to dismiss was initially filed with respect to Plaintiff's original Complaint and on behalf of CMC and Umar only.  (Dkt. No. 16.)  However, since that time, (1) Plaintiff filed her Amended Complaint, naming Morgan as a Defendant for the first time (Dkt. No. 18), (2) defense counsel appeared on behalf of Carpio and Morgan and requested that the Court deem their motion to dismiss as filed on behalf of Morgan and Carpio as well (Dkt. Nos. 36-37, 43-44), and (3) defense counsel requested that the Court consider CMC Defendants' motion to dismiss in light of Plaintiff's Second Amended Complaint (Dkt. No. 81).

seeking or entitled to damages for conscious pain and suffering (i.e., as a survivorship claim or as part of a wrongful death claim) or (ii) the nature of the pain and suffering that he experienced, or the manner in which he died (*id.* at 14-16); (4) Plaintiff is not entitled to punitive damages because she has failed to allege facts plausibly suggesting that CMC Defendants acted with evil motive or intent or reckless indifference to Wilkins' constitutional rights (*id.* at 16); and (5) in the alternative, the Court should strike paragraphs 18, 21-27, as well as specific portions of paragraphs 20, 28, and 29, because (a) these paragraphs contain allegations about the provision of medical care to other individuals and are therefore irrelevant, and (b) these paragraphs are scandalous because they are "speculative" and "go into far too much detail" about CMC Defendants' "past alleged wrongs" (*id.* at 17-18).

### b.   Plaintiff's Opposition Memorandum of Law

Generally, in opposition to CMC Defendants' motion, Plaintiff asserts nine arguments: (1) she has alleged facts plausibly suggesting that CMC Defendants were subjectively aware of Wilkins' serious medical condition, based upon (a) the content of his sick call slip, (b) his report that he had a history of psychiatric problems, (c) CMC Defendants' observations of his physical condition, (d) Jane Doe No. 1's decision to refer him to be seen by a mental health provider, (e) the reasonable inference that his symptoms were severe, drawn from the fact that he actually killed himself, and (f) the reports of "numerous inmates" that Wilkins had previously communicated to CMC Defendants his threats to commit suicide (Dkt. No. 30 at 10-15 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.]); (2) the reasonableness of CMC Defendants' determination that Wilkins was "faking" his medical condition, or its severity, should be evaluated on a complete evidentiary record, rather than at the pleading stage (*id.* at 15); (3)

Plaintiff has alleged facts plausibly suggesting that CMC is subject to liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because, as she adequately alleges, (a) CMC has policies, customs, and/or practices of providing inadequate medical care and employing unqualified medical care providers at the Jail, and other correctional facilities across New York State, for the sake of profitability, (b) CMC's policies, customs, and/or practices are matters of public record, in that they are reflected in, *inter alia*, investigations undertaken, reports issued, and penalties imposed against CMC by governmental agencies, and (c) Plaintiff is not required to plead with special particularity the precise policies, customs, or practices at issue (*id.* at 16-20); (4) in the alternative, the Court should grant Plaintiff leave to amend her Second Amended Complaint so that she may assert further factual allegations in support of her theory of municipal liability (*id.* at 20-21); (5) Plaintiff has alleged facts plausibly suggesting that Umar was personally involved in the violation of Wilkins' federal constitutional rights because, as she adequately alleges, (a) Umar had direct knowledge of his employees' "repeated misconduct" related to "highly publicized deaths that occurred at [other] CMC facilities" that occurred in the years before Wilkins' suicide, but he failed to take remedial action, (b) Umar's company (CMC) based its employees' compensation on the number of "times they refused to send inmates in need of emergent medical treatment to the hospital or to outside specialists," and (c) Umar failed to retain "appropriately licensed medical staff" (*id.* at 21-23); (6) in the alternative, the Court should grant Plaintiff leave to amend her Second Amended Complaint so that she may assert further factual allegations concerning Umar's personal involvement (*id.* at 23); (7) CMC Defendants' motion to strike certain paragraphs of Plaintiff's Second Amended Complaint must be denied because (a) these factual allegations support Plaintiff's assertion that Wilkins suffered

constitutional violations pursuant to CMC's policies, customs, or practices under *Monell*, (b) these factual allegations (and the documents attached to Plaintiff's Complaint, on which these factual allegations are based) are relevant to Defendants' knowledge, notice, motive, and modus operandi, and (c) CMC Defendants will not be unfairly prejudiced by these factual allegations because they are largely matters of public record and government investigation (*id.* at 23-27); (8) Plaintiff has alleged facts plausibly suggesting the appropriateness of imposing punitive damages, and whether such damages are warranted should be determined based on record evidence (*id.* at 27-28); and (9) Plaintiff has adequately pleaded claims for conscious pain and suffering and wrongful death under New York State law and, to the extent that she has not, the Court should grant her leave to amend her Second Amended Complaint to "include information about how and why each distributee of the decedent's estate is entitled to inherit should . . . Plaintiff successfully prosecute her claims" (*id.* at 29-30).

### c. CMC Defendants' Reply Memorandum of Law

Generally, in their reply, CMC Defendants reiterate the arguments set forth in their memorandum of law and further argue as follows: (1) Plaintiff's "First Cause of Action" and "Second Cause of Action" (i.e., her deliberate medical indifference claim and municipal liability claim pursuant to *Monell*) must be dismissed because (a) Plaintiff's factual allegations in support of those claims are made "upon information and belief" and are conclusory and unsupported, (b) Plaintiff has failed to allege facts plausibly suggesting that Wilkins notified any of the CMC Defendants that he "had any suicidal ideation," (c) the Complaint's factual allegations do not specify the identities of the "other inmates" who reported that Wilkins was severely depressed and threatened to commit suicide, or to whom their "reports" were made, (d) CMC Defendants'

12

alleged actions or failures to act were not "barbarous" or conscience-shocking, but rather constitute mere disagreement over the proper course of treatment, (e) Plaintiff has failed to allege facts plausibly suggesting that Wilkins made any other complaints in the eight-day period between his visit with Morgan and his suicide, and (f) Plaintiff has failed to adequately plead the existence of a municipal policy or custom because the Second Amended Complaint's factual allegations concern only Wilkins' "individual experience" (Dkt. No. 35 at 4-8, 12 [CMC Defs.' Reply Memo. of Law]); (2) the factual allegations in Plaintiff's Second Amended Complaint that concern other inmates at other locations are irrelevant to Plaintiff's claims (*id.* at 8-10); (3) Plaintiff's "alternative guesses" about "what may have happened to" Wilkins–including that the Commission of Correction may be investigating his death, that D'Agostino improperly received payments from CMC and "look[ed] the other way" with respect to CMC's inadequate services, and that CMC rewards employees for saving on costs by providing inadequate medical care–are mere unsupported "ruminations" (*id.* at 8-9); (4) Umar was not personally involved in any alleged violations of Wilkins' constitutional rights, and Plaintiff has failed to allege facts plausibly suggesting that Wilkins' "situation" was "brought to the attention of" Umar (*id.* at 10); (5) Plaintiff has failed to allege facts plausibly suggesting entitlement to damages for Wilkins' conscious pain and suffering because the Second Amended Complaint does not allege "the method of" Wilkins' suicide or the length and extent of his suffering "between his initial attempt and his death" (*id.* at 13); and (6) Plaintiff has failed to allege facts plausibly suggesting that his dependents have any reasonable expectation of pecuniary benefit such that damages for loss of companionship are appropriate (*id.* at 13).[8]

---

[8]     County Defendants also filed a memoranda of law in opposition to CMC Defendants' motion to dismiss, arguing that, to the extent that CMC Defendants are also seeking dismissal of County Defendants' cross-claims, CMC Defendants' motion should be denied at this time.  (Dkt. No. 29, Attach. 6 [County Defs.' Opp'n Memo. of Law to CMC Defs.' Mtn. to

2.    **Dr. Valle's Motion to Dismiss Plaintiff's Second Amended Complaint**

a.    **Dr. Valle's Memorandum of Law**

Generally, in support of his motion to dismiss Plaintiff's Second Amended Complaint, Dr. Valle advances the following five arguments: (1) Plaintiff's deliberate indifference to serious medical needs claim must be dismissed because (a) to the extent that Plaintiff has pleaded facts plausibly suggesting that Morgan failed to inform Dr. Valle about the seriousness of Wilkins' condition, Dr. Valle could not have known of, and disregarded, an excessive risk to Wilkins' health or safety, (b) she has failed to allege facts plausibly suggesting that Wilkins' suffered a sufficiently serious deprivation of medical care, in that the alleged delay of eight days (i.e., the time between the date on which Wilkins was seen by Morgan and the date on which he committed suicide) was not an unreasonable delay or interruption in his medical care, (c) Plaintiff has not alleged facts plausibly suggesting that Wilkins informed Morgan that he had experienced suicidal ideations, and his score on his mental health screening did not reveal "expressed suicidal symptoms," (d) Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle's actions or failure to act amounted to deliberate indifference, that he was aware the reports of "other inmates" about Wilkins' behavior, or that he shared in CMC's alleged motives or recklessness based on other, unrelated incidents (Dkt. No. 83, Attach. 3, at 6-13 [Valle's Memo. of Law in Support of Mtn. to Dismiss Plf.'s Second Am. Compl.]); (2) Plaintiff's "Second Cause of Action" must be dismissed because (a) she has not alleged facts plausibly suggesting

_____

Dismiss].)  In their reply to Plaintiff's opposition, CMC Defendants note that they do not oppose County Defendants' interposition of cross-claims, but that they "reserve their rights to address" the cross-claims if Plaintiff's Second Amended Complaint is not dismissed in its entirety.  (Dkt. No. 35 at 15-16.)  The Court does not construe CMC Defendants' motion to dismiss as requesting dismissal of County Defendants' cross-claims and, given CMC Defendants' lack of opposition to the interposition of these cross-claims, the Court need not further discuss these cross-claims at this time.

that Dr. Valle was personally involved in any constitutional deprivation to which Wilkins was subjected, took part in any unconstitutional "pattern [or] practice" adopted by CMC, or knew or should have known about the actions of any other CMC employee (*id.* at 13-18); (3) the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims (*id.* at 19); (4) Plaintiff's claims for wrongful death and conscious pain and suffering must be dismissed because she has failed to allege facts plausibly suggesting that Dr. Valle acted wrongfully or negligently with respect to Wilkins, or that a physician-patient relationship existed between them (*id.* at 19-21); and (5) Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle had the "evil motive or intent" required to establish entitlement to punitive damages in connection with her § 1983 claim (*id.* at 21).

### b.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Dr. Valle's motion to dismiss her Second Amended Complaint, Plaintiff asserts the following five arguments: (1) she has adequately pleaded Dr. Valle's personal involvement in the violation of Wilkins' constitutional rights because she has alleged facts plausibly suggesting that (a) Dr. Valle was "personally informed" of Wilkins' mental health condition, complaints of anxiety, depression, lethargy, and suicidal ideations, physical symptoms, and psychiatric history by Morgan, (b) other inmates reported their observations of Plaintiff's behavior before his death, including his "multiple" threats to commit suicide, (c) Dr. Valle "created and/or tolerated" a policy of "failing to provide appropriate levels of qualified medical providers at" the Jail, and failed to "adopt appropriate policies regarding" the screening and supervision of detainees at the Jail, and (d) Dr. Valle, a supervisory official, "failed to act on information that constitutional rights were being violated" as evidenced by

"highly publicized deaths" at the Jail and other "CMC facilities" (Dkt. No. 85 at 6-14 [Plf.'s Opp'n Memo. of Law]); (2) the fact that Dr. Valle did not actually evaluate or treat Wilkins is not dispositive of her wrongful death claim, and Dr. Valle had a legal duty, by virtue of his position, to provide Wilkins with adequate medical care (*id.* at 14-15); (3) the Court should exercise supplemental jurisdiction over Plaintiff's state law claims against Dr. Valle because several federal claims against other Defendants remain pending (*id.* at 16); (4) Plaintiff has adequately pleaded her entitlement to punitive damages in light of (a) Dr. Valle's failure to evaluate or treat Wilkins, despite knowledge of Wilkins' medical condition and complaints, and (b) CMC's conduct "across the State of New York and the Commonwealth of Pennsylvania" (*id.* at 17-18); and (5) in the alternative, Plaintiff should be given leave to amend her Second Amended Complaint[9] if the Court concludes that dismissal of "some or all" of her claims is warranted (*id.* at 18-19).

### c.    Dr. Valle's Reply Memorandum of Law

Generally, in his reply memorandum of law, Dr. Valle reiterates the arguments set forth in his memorandum of law and further argues as follows: (1) Plaintiff's deliberate indifference claim, as framed by the Second Amended Complaint's factual allegations, asserts a "medical delay," rather than a "medical denial" (Dkt. No. 87 at 3 [Valle's Reply Memo. of Law]); (2) Plaintiff's factual allegations concerning the actions not taken by Morgan constitute mere disagreements over the proper course of treatment, rather than a deliberate indifference to

---

[9]    In support of this request, Plaintiff notes that she has "obtained new evidence . . . by way of subpoenas" to, *inter alia*, the Commission of Correction and OAG, including "discovery relative to four other individuals who died at the Schenectady County Correctional Facility in the span of less than three years that detail the horrifically inadequate medical care they were provided[.]"  (Dkt. No. 85 at 19.)

Wilkins' serious medical needs (*id.* at 3-4, 15); (3) Plaintiff has not alleged facts plausibly suggesting that Morgan was aware of Wilkins' "threats of suicide," and therefore could not have advised Dr. Valle of those threats (*id.* at 4-5); (4) Plaintiff's factual allegation that Morgan placed Wilkins on a wait list to see Dr. Valle does not render plausible Plaintiff's factual allegation that Wilkins' medical condition was severe (*id.* at 5); (5) Plaintiff's factual allegation that other detainees reported that Wilkins was "severely depressed" before his death does not render his claims plausible because Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle was aware of this information (*id.* at 5-6); (6) according to the "screening report" completed by Morgan, Wilkins "had no history of previous suicidal ideations or attempts, did not show signs of depression, and did not express feelings of hopelessness" (*id.* at 7); (7) Morgan's medical notes reflect that Wilkins had only a "minor" psychiatric history (*id.* at 8); (8) Plaintiffs' factual allegations concerning the unconstitutional policies, customs, and practices that existed at CMC facilities do not refer to Dr. Valle, but rather to CMC, Umar, and Carpio (*id.* at 10-11, 14); (9) Plaintiff has failed to allege facts plausibly suggesting that Dr. Valle, or his subordinates, were involved in any "previous misconduct carried out by . . . CMC" or that Dr. Valle was on notice that his subordinates behaved improperly (*id.* at 12-13); and (10) Plaintiff should not be permitted to amend her Second Amended Complaint because (a) amendment would be futile, (b) she does not argue that the "newly discovered evidence" to which she refers in her opposition memorandum of law could not have been discovered earlier with reasonable diligence, and (c) she does not argue that the "newly discovered evidence" relates to Dr. Valle (*id.* at 19-21).

### 3. Dr. Valle's Motion to Dismiss Cross-Claims Interposed by County Defendants

#### a. Dr. Valle's Memorandum of Law

Generally, in support of his motion to dismiss County Defendants' cross-claims, Dr. Valle asserts two arguments: (1) County Defendants may not recover under theories of common law contribution or indemnification with respect to § 1983 claims; (2) if his motion to dismiss Plaintiff's Second Amended Complaint is granted, then County Defendants' common law contribution and indemnification claims against him must also be dismissed because (a) Dr. Valle would have breached no duty owed to Wilkins as a matter of law and (b) the nature of Plaintiff's factual allegations with respect to County Defendants' conduct is different in nature than those relating to Dr. Valle. (Dkt. No. 97, Attach. 1, at 5-6 [Valle's Memo. of Law in Support of Mtn. to Dismiss County Defs.' Cross-Claims].)

Generally, in opposition to Dr. Valle's motion, County Defendants assert three arguments: (1) if Dr. Valle failed to provide proper medical care to Wilkins, then County Defendants "are entitled to pass that liability onto Dr. Valle for failing to fulfill the obligation to supply the County with medical treatment for inmates at the [J]ail"; (2) if County Defendants are ultimately found liable pursuant to Plaintiff's state law claims and "have to pay [P]laintiff for any fault of Dr. Valle," they are entitled to seek contribution from Dr. Valle; and (3) the fact that Plaintiff's allegations concerning County Defendants relate to issues not directly involving Dr. Valle (for example, contracting with CMC despite its probationary status and improper payments to D'Agostino) is irrelevant to Dr. Valle's potential liability to County Defendants for contribution. (Dkt. No. 98 at 2-5 [County Defs.' Opp'n Memo. of Law to Valle's Mtn. to Dismiss Cross-Claims].)

Generally, in reply, Dr. Valle argues that he is seeking dismissal of County Defendants' cross-claims only if his motion to dismiss Plaintiff's Second Amended Complaint is granted. (Dkt. No. 106 at 4 [Valle's Reply Memo. of Law in Further Support of Mtn. to Dismiss County Defs.' Cross-Claims].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing Motions to Dismiss

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has

held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atl. Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.*

at 1965-74.  The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]."  *Id*. at 1965.  More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true.  *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief."  *Id*. at 1950 (internal quotation marks and citations omitted).  However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement."  *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949.  Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not  suffice.  *Id.* (internal citations and alterations omitted).  Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[10]

---

[10] *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . . Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

### B.  Legal Standards Governing Claim of Deliberate Indifference to Serious Medical Needs

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 25 [1993]).[11]  Within that framework, "[t]he Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *accord, Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  However, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103-04).  In this context, a prison official violates the Eighth Amendment only when two requirements are satisfied. *Farmer*, 511 U.S. at 834.

### 1.  Objective Requirement–Serious Medical Needs

"The first requirement is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Salahuddin*, 467 F.3d at 279 (citation and internal quotation marks omitted); *accord*, *Farmer*, 511 U.S. at 834.  Evaluation of the objective prong involves two inquiries: (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 279-80.

---

[11]  *See also Iacovangelo v. Corr. Med. Care, Inc.,* 624 F. App'x 10, 12 (2d Cir. 2015) ("A claim for indifference to the medical needs of a pre-trial detainee in state custody is properly analyzed under the Due Process Clause of the Fourteenth Amendment, though such claims 'should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.'") (quoting *Caiozzo v. Koreman*, 581 F.3d 63, 72 [2d Cir. 2009]).

With regard to the first inquiry, because a prison official need only provide "reasonable care," one who acts reasonably in response to an inmate's health risk "cannot be found liable under the Cruel and Unusual Punishments clause." *Id.* at 279-80 (quoting *Farmer*, 511 U.S. at 845). "The word 'adequate' reflects the reality that '[p]rison officials are not obligated to provide inmates with whatever care the inmates desire.'" *Banks v. Annucci*, 48 F. Supp. 3d 394, 408-09 (N.D.N.Y. 2014) (Hurd, J.) (quoting *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 [S.D.N.Y. 2008]).

With regard to the second inquiry, determining whether the alleged inadequacy was "sufficiently serious" involves an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280 (citation omitted). If the unreasonable medical care alleged was a "failure to provide any treatment" for the inmate's medical condition, courts examine whether the condition itself is sufficiently serious. *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003) ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition.") (footnote omitted). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin*, 467 F.3d at 280 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 [2d Cir. 1998]); *accord, Rodriguez v. Manenti*, 606 F. App'x 25, 26 (2d Cir. 2015) (summary order); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("Objectively, the alleged deprivation must be

'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists.") (citation omitted). "A finding of a serious medical need 'is necessarily contextual and fact-specific,' and thus 'must be tailored to the specific circumstances of each case.'" *Shenk v. Cattaraugus Cty.*, 305 F. App'x 751, 753 (2d Cir. 2009) (summary order) (quoting *Smith*, 316 F.3d at 185).

However, "[i]n cases where the inadequacy is in the medical treatment given," as opposed to a complete absence of treatment, "the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Smith*, 316 F.3d at 185). "In other words, the Court asks 'whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation.'" *Kidkarndee v. Koenigsmann*, 12-CV-0502, 2014 WL 1239319, at *14 (N.D.N.Y. Mar. 25, 2014) (Suddaby, J., adopting Report-Recommendation of Hummel, M.J.) (quoting *Frank v. Cty. of Ontario*, 884 F. Supp. 2d 11, 19 [W.D.N.Y. 2012]). In short, although courts "sometimes speak of a 'serious medical condition' as the basis for an Eighth Amendment Claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability." *Salahuddin*, 467 F.3d at 280.

### 2. Subjective Requirement–Deliberate Indifference

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. "[A]

complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *accord, Daniels v. Williams*, 474 U.S. 327, 331-33 (1986) (explaining that "injuries inflicted by governmental negligence are not addressed by the United States Constitution"). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, equivalent to "subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 184. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280; *accord, Farmer*, 511 U.S. at 837-38 ("An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis."). Because this inquiry is subjective, "[p]rison officials may . . . introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Salahuddin*, 467 F.3d at 280 (quoting *Farmer*, 511 U.S. at 844). However, "evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance*, 143 F.3d at 703.

III.    ANALYSIS

A.    Construction of Plaintiff's Second Amended Complaint

As an initial matter, a few words are appropriate regarding the nature of the claims and factual allegations set forth in Plaintiff's Second Amended Complaint.  Plaintiff's "Second Cause of Action" is asserted against CMC, Dr. Valle, Umar, Carpio, D'Agostino, and Barrett, and is predicated on the "express policy, practices or the inactions of [CMC's] policy makers[.]"  (Dkt. No. 75 at ¶ 47.)  Plaintiff alleges that "these defendants failed to adopt appropriate policies regarding appropriate supervision and/or screening to [*sic*] detainees at the Schenectady County Jail who were in need of closer supervision because of mental health problems[.]"  (*Id.*)  Plaintiff further alleges that "one reason why [Wilkins] failed to receive adequate medical treatment was because of concerns by the above-listed defendants regarding the expenses involved in properly caring for him and other detainees."  (*Id.* at ¶ 48.)  Moreover, Plaintiff alleges that all Defendants "were acting under color of state law" at all times relevant to her claims.  (*Id.* at ¶ 35.)

Irrespective of the labels denoting Plaintiff's claims set forth in, and the structure of, Plaintiff's Second Amended Complaint, the Court notes that "*Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).  Rather, "[l]iability under section 1983 is imposed on the municipality when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff."  *Askins*, 727 F.3d at 253 (citing *Segal v. City of New York*, 459 F.3d 207, 219 [2d Cir. 2006] ["*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends*

liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."]). Establishing municipal liability thus requires a plaintiff to demonstrate that (1) he "suffered a tort in violation of federal law committed by the municipal actors," and (2) "that their commission of the tort resulted from a custom or policy of the municipality." *Id.* (citing *Monell*, 436 U.S. at 690-91). Relatedly, § 1983 claims asserted against local government officials in their official capacity are duplicative of claims asserted directly against the municipal organization on the basis of a municipal policy or custom pursuant to which a plaintiff's constitutional rights were violated. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* . . . local government units can be sued directly for damages and injunctive or declaratory relief."); *accord, e.g., Henning v. New York City Dep't of Corr.*, 14-CV-9798, 2016 WL 297725, at *1 (S.D.N.Y. Jan. 22, 2016) (concluding that, "because Plaintiff has failed to state a claim under *Monell*, any claims against the Individual Defendants in their official capacities must also be dismissed").

Affording Plaintiff's Second Amended Complaint a liberal construction, the Court construes it to assert (1) a § 1983 claim against the individual Defendants (that is, deliberate indifference to Wilkins' serious medical needs, as set forth in Plaintiff's "First Cause of Action"), for which CMC and Schenectady County are also liable because the underlying constitutional violation was undertaken pursuant to a policy, custom, or practice of CMC and/or Schenectady County (as asserted in Plaintiff's "Second Cause of Action"); (2) a claim for wrongful death under New York State law (as asserted in Plaintiff's "Fourth Cause of Action"); and (3) claims

for conscious pain and suffering (on behalf of Wilkins' estate)[12] and loss of companionship (on

behalf of Wilkins' surviving children) under New York State Law (as asserted in Plaintiff's

"Third Cause of Action").  (Dkt. No. 75 at ¶¶ 38-57.)  To the extent that Plaintiff identifies

Umar, Carpio, Dr. Valle, D'Agostino, and Barrett as the Defendants at issue with respect to her

"Second Cause of Action" (i.e, her *Monell* claim), the Court construes Plaintiff's "Second Cause

of Action" as asserting official capacity claims against these Defendants.

>    **B.     Whether Plaintiff's Deliberate Indifference Claim Should Be Dismissed with
>            Respect to Morgan and Dr. Valle[13]**

After carefully considering the matter, the Court answers this question in the negative for

substantially the reasons set forth in Plaintiff's opposition memoranda of law.  (Dkt. No. 30 at

10-15 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.]; Dkt. No. 85 at 6-10 [Plf.'s Opp'n Memo.

of Law to Valle's Mtn. to Dismiss Plf.'s Second Am. Compl.].)  To those reasons, the Court adds

the following analysis, which is intended to supplement (and not to supplant) the reasons.

The crux of the above-referenced Defendants' arguments with respect to Plaintiff's

deliberate indifference claim is that no one communicated the seriousness of Plaintiff's condition

to them.  Specifically, CMC Defendants acknowledge that suicidality is a serious medical

condition for purposes of Plaintiff's deliberate indifference claim.  (Dkt. No. 16 at 11 [CMC

---

[12]     "In contrast to a claim for wrongful death, which 'belongs to the decedent's
distributees and is designed to compensate the distributees themselves for their pecuniary losses
as a result of the wrongful act,' a claim for conscious pain and suffering may only be brought by
'the estate of the deceased, rather than the distributees.'"  *Quinn v. U.S.*, 946 F. Supp. 2d 267,
277-78 (N.D.N.Y. 2013) (Suddaby, J.) (quoting *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118,
121 [N.Y. 2011]).

[13]     Because these Defendants are implicated directly in the provision of medical care
to Wilkins, the Court considers their respective motions together.

Defs.' Memo. of Law] ["Admittedly, suicide is a serious condition, as required by this cause of action."].)  Instead, CMC Defendants argue that (1) Plaintiff has failed to allege facts plausibly suggesting that the seriousness of Wilkins' condition was communicated to them and (2) although Plaintiff's factual allegations "potentially demonstrate a lapse in medical care," they do not plausibly suggest deliberate indifference to Wilkins' serious medical needs.  (*Id.* at 11-13.)

Similarly, Dr. Valle argues that "this is a 'medical delay' case," and that the delay in time to which Wilkins was subjected in order to see Dr. Valle–eight days–was not sufficiently harmful.[14]  (Dkt. No. 83, Attach. 3, at 9-10 [Valle's Memo. of Law].)  Dr. Valle further argues that the length of the delay in seeing Wilkins was the result of Wilkins' failure to communicate the seriousness of his condition.  (*Id.* at 10 ["Plaintiff never pleaded that decedent told . . . Morgan that he was experiencing suicidal ideations."] [footnote omitted]; *id.* at 11 ["Decedent never made defendant Morgan aware, and thus defendant Morgan never made defendant Valle aware, that he was experiencing suicidal ideation."]).  Accordingly, Dr. Valle argues that Plaintiff has not adequately pleaded that he was deliberately indifferent toward Wilkins (i.e., the subjective prong of the legal standard) because, again, Plaintiff has not alleged facts plausibly suggesting that Valle was aware of Plaintiff's condition.  (*Id.* at 12-13 [arguing that plaintiff's allegation regarding reports from other inmates "does not help because plaintiff does not allege that defendant Valle was ever made aware of this information."].)

---

[14]     This eight-day period appears to refer to the time between the date on which Morgan placed Wilkins on Dr. Valle's wait list and the date of Wilkins' suicide.  Of course, this argument presumes that the "delay" or "interruption" in treatment would not have actually been longer (i.e., that Dr. Valle would have seen and/or treated Plaintiff on the eighth day, but for Wilkins' suicide).  Plaintiff does not allege that Wilkins was actually scheduled to be seen by Dr. Valle on any particular date.

With respect to the objective prong of an Eighth Amendment claim, "courts have found that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." *Allah v. Kemp*, 08-CV-1008, 2010 WL 1036802, at *6 n.9 (N.D.N.Y. Feb. 25, 2010), *adopted*, 2010 WL 1035657, at *1 (N.D.N.Y. Mar. 18, 2010) (Mordue, C.J.) (citing *Covington v. Westchester Cty. Dep't of Corr.*, 06-CV-5369, 2010 WL 572125, at *6 [S.D.N.Y. Jan. 25, 2010] and *Zimmerman v. Burge*, 06-CV-0176, 2009 WL 3111429, at *8 [N.D.N.Y. Sept. 24, 2009] [Sharpe, J., adopting Report-Recommendation of Lowe, M.J.]).

With respect to the subjective prong of an Eighth Amended claim, Plaintiff's Second Amended Complaint alleges, *inter alia*, the following: (1) on May 16, 2014, Wilkins submitted a sick call slip, in which he complained of "really bad" anxiety and panic attacks, depression, trouble sleeping, and feeling tired and weak (Dkt. No. 75 at ¶ 17); (2) on May 19, 2014, Jane Doe No. 1 "triaged" his sick call slip and concluded, from her observations of and conversations with Wilkins, that he was "exhibiting obvious signs of depression and suicidal observation [*sic*]" (*id. at* ¶ 18); (3) on May 20, 2014 (four days later after Wilkins submitted his sick call slip), Morgan (a licensed clinical social worker) conducted "a 'brief' mental health screening and assessment" (*id. at* ¶ 19); (4) during that visit, (a) Morgan "directly observed" Wilkins' shortness of breath, rapid speech, "anxious motor activity, "an inability to sit still, heart palpitations when panicking, and anxiety" (*id.*), (b) Wilkins informed Morgan of a "prior involuntary commitment" and his "history of mental health issues," including panic attacks and depression, which had grown worse since being detained at the Jail (*id.*) and (c) Wilkins talked about "several significant issues in his life," including his criminal case and "his wife's health" (*id.*); and (5)

other inmates also reported, to unspecified individuals, that Wilkins (a) was "severely depressed," (b) "threatened to commit suicide on multiple occasions," (c) was "being denied medical treatment," (d) felt "unhappy" and "left alone," (e) attempted to "scratch a tattoo . . . off of his neck," and (f) was overheard "screaming on the phone" the night of his death (*id.* at ¶ 22). Despite the complaints and medical history that Wilkins relayed to Jane Doe No. 1 and Morgan, as well as Morgan's observations, Morgan merely gave Wilkins "literature" on anxiety-coping skills and relaxation techniques and placed him on a wait list to see Dr. Valle (where he remained for eight days until his suicide). (*Id.* at ¶ 21.)

Accepting Plaintiff's factual allegations as true, the Court concludes that Plaintiff has, albeit barely,[15] adequately pleaded a claim for deliberate indifference to Wilkins' serious medical needs, based upon a medical condition that was sufficiently communicated to the moving Defendants.[16] To the extent Defendants argue that they lacked the requisite subjective

---

[15] CMC Defendants argue that Plaintiff's Second Amended Complaint does not specify the identity of "other inmates" who made "reports" of Wilkins' troubling behavior and statements preceding his suicide, to whom those reports were made, or when those reports were made. (Dkt. No. 16 at 12.) The Court concludes that, in light of Plaintiff's other factual allegations (taken together and accepted as true), Plaintiff's failure to allege these specifics does not (at this stage of the litigation) warrant dismissal of her deliberate indifference claim. *Twombly*, 127 S. Ct. at 1974 ("[w]e do not require heightened fact pleading of specifics . . . ."). The Court offers no opinion whether Plaintiff's claim may survive a motion for summary judgment.

[16] Although Dr. Valle identifies the alternative way that he was allegedly deliberately indifferent (Dkt. No. 3, Attach. 3, at 8-9; *accord*, Dkt. No. 75 at ¶ 21 [alleging that "Morgan failed to inform Dr. Valle of the emergent nature of" Wilkins' symptoms, or, "[a]lternatively," Morgan "did inform Dr. Valle . . . and [Dr. Valle] failed to take action"]), Dr. Valle does not argue that Plaintiff's use of alternative pleading is improper under the circumstances. Generally, such alternative pleading is permissible. Fed. R. Civ. P. 8(d)(2). Moreover, in her memorandum of law in opposition to Dr. Valle's motion to dismiss, Plaintiff "acknowledges that [s]he cannot state a [d]eliberate [i]ndifference claim against . . . [Dr.] Valle if he was not actually informed about . . . Plaintiff's deteriorating mental health condition." (Dkt. No. 85 at 6 [footnote omitted].)

culpability to support Plaintiff's deliberate indifference claim, this argument presumes the existence of a factual record supporting it.[17] *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways . . . ."); *Chance*, 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.").

Accordingly, CMC Defendants' motion to dismiss Plaintiff's deliberate indifference claim is denied with respect to Morgan, and Dr. Valle's motion to dismiss Plaintiff's deliberate indifference claim to, the extent that it is asserted against him in his personal capacity, is also denied.

---

[17]     In support of his motion to dismiss, Dr. Valle has filed an exhibit titled "Intake Mental Health Screening and Assessment." (Dkt. No. 83, Attach. 1 [capitalization omitted].) The form reflects that Wilkins did have a history of psychiatric care, prescribed psychotropic medications, and a psychiatric commitment. (*Id.*) However, as Dr. Valle observes, the form also reflects that Wilkins scored only "3 Yes's" based (presumably) on his responses to Morgan's questions; the form directs the screener completing it to "alert Shift Commander and place inmate on constant observation" where the detainee scores an "8" or more. (*Id.*) The form was not attached to Plaintiff's Second Amended Complaint or expressly referenced therein, but, as discussed above, some of Plaintiff's central factual allegations concern what information Wilkins conveyed to Morgan. Under the circumstances, even assuming that this document may properly be considered on Dr. Valle's motion to dismiss, the Court concludes that its contents do not "contradict" Plaintiff's factual allegations, such that Plaintiff's factual allegations related to his screening by Morgan are stripped of their presumption of truth for purposes the pending motions to dismiss. *Cf. Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011). The form may be persuasive to a factfinder charged with determining whether Morgan and/or Dr. Valle were made aware of the seriousness of Plaintiff's medical condition. At this stage, however, the document (which, presumably, was created by Morgan) reflects a factual dispute between the parties that is potentially pivotal to Plaintiff's deliberate indifference claim.

**C.** **Whether Plaintiff's Deliberate Indifference Claim Should Be Dismissed as to Umar and Carpio for Failure to Allege Facts Plausibly Suggesting Personal Involvement in the Violation of His Constitutional Rights**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in CMC Defendants' memoranda of law. (Dkt. No. 16 at 13-14 [CMC Defs.' Memo. of Law]; Dkt. No. 35 at 10-12 [CMC Defs.' Reply Memo. of Law].)

The Court would add only that the single substantive factual allegation referencing Umar or Carpio in Plaintiff's Second Amended Complaint is as follows:

> Defendant CMC, together with its President Emre Umar and owner Maria Carpio (who are married to each other), have engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various facilities they manage, as well as inadequate medical and mental health care in general. Included in these practices is the affirmative policy of CMC in basing its employee's salaries, and continued retention, on the number of times that they send detainees to outside medical providers. The basis for this pattern and practice is simple: Money. [CMC] takes enormous sums from various municipalities throughout New York State, some of which are provided by contracts secured through political contributions, and then provides inadequate staffing and medical care in the name of profitability. The contracts that CMC has with various county governments are "all inclusive," with every dollar that CMC pays for outside medical providers coming directly through CMC's profit margins.

(Dkt. No. 75 at ¶ 25.)

Based upon this singular reference to the role of Umar and Carpio (even when it is considered in conjunction with the other factual allegations set forth in Plaintiff's Second Amended Complaint), the Court concludes that Plaintiff has not alleged facts plausibly suggesting that Umar or Carpio were personally involved in any violation of Wilkins' constitutional rights.

As CMC Defendants correctly note, Umar and Carpio cannot be held liable under § 1983 solely on the basis of their supervisory positions.  (Dkt. No. 16 at 14 [CMC Defs.' Memo of Law].)  Rather, a supervisory official's personal involvement must be shown by evidence demonstrating that the official did the following: (1) "participated directly in the" constitutional violation complained of, (2) "after being informed of the violation through a report or appeal, failed to remedy the wrong," (3) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (4) "was grossly negligent in supervising subordinates who committed the wrongful acts," or (5) "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *accord, Henderson v. Fischer*, 12-CV-1704, 2015 WL 1413965, at *9-10 (N.D.N.Y. Mar. 18, 2015) (McAvoy, J., adopting Report-Recommendation of Dancks, M.J.).

However, Plaintiff has not alleged facts plausibly suggesting that Umar or Carpio were personally involved under either the first or second *Colon* prongs (that is, that they participated directly in Wilkins' medical care or were informed of any constitutional violation and failed to remedy it).  Moreover, for the same reasons discussed below in Part III.D of this Decision and Order (with respect to whether Wilkins' rights were violated pursuant to a policy or custom of CMC), Plaintiff's allegation that Umar and Carpio were personally involved in the violation of Wilkins' constitutional rights because they "cut corners" in the name of profit at other facilities is entirely conclusory and/or conjectural.  With respect to the fourth *Colon* prong, Plaintiff does not allege in her Second Amended Complaint that Umar or Carpio had supervisory responsibility

with respect to either Morgan or Dr. Valle.[18]  Moreover, Plaintiff does not allege facts plausibly

suggesting the manner in which the supervision of medical staff at the Jail was grossly negligent,

or a causal connection between any such gross negligence in supervision and Wilkins' death.

Finally, Plaintiff has not alleged facts plausibly suggesting that Umar or Carpio failed to act on

information that unconstitutional acts were occurring at the Jail, given the relatively small

number of factually unrelated incidents that allegedly occurred at other facilities (in previous

years) at which CMC provided medical services across New York State.

For each of these reasons, as well as those set forth in CMC Defendants' memoranda of

law, Plaintiff's deliberate indifference claim is dismissed as asserted against Umar and Carpio in

their individual capacities.[19]

### D. Whether Plaintiff's Deliberate Indifference Claim Should Be Dismissed with Respect to CMC

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons stated in CMC Defendants' reply memorandum of law.  (Dkt. No. 35 at 11-12

---

[18]     In her Second Amended Complaint, Plaintiff alleges that Dr. Valle was
"responsible for providing mental health care at the . . . Jail, and for supervising mental health
staff employed by CMC at the . . . Jail."  (Dkt. No. 75 at ¶ 11.)  It is not clear from Plaintiff's
Second Amended Complaint whether Umar or Carpio have any medical education or training, or
who (if anyone) served in a supervisory or directorial role for CMC at the Jail.  Moreover,
Plaintiff has not alleged facts plausibly suggesting that Dr. Valle's supervision of Morgan was
inadequate, the manner in which it was inadequate, or that Dr. Valle's supervision had a causal
relationship with the violation of Wilkins' constitutional rights.

[19]     "Although the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662
(2009), may have heightened the requirements for showing a supervisor's personal involvement
with respect to certain constitutional violations, we need not reach *Iqbal*'s impact on *Colon* in
this case, for [Plaintiff's] [Second Amended C]omplaint did not adequately plead [Umar's or
Caprio's] personal involvement even under *Colon*."  *Shaw v. Prindle*, 15-CV-2883, 2016 WL
4578630, at *1 n.2 (2d Cir. Sept. 1, 2016) (quoting *Grullon v. City of New Haven*, 720 F.3d 133,
139 [2d Cir. 2013]).

[CMC Defs.' Reply Memo. of Law].)[20]

The Court would add only that Plaintiff has not alleged facts plausibly suggesting that CMC has a policy of making decisions regarding medical intervention based on cost and profitability concerns, much less that Wilkins' harm was causally connected to such a policy; Plaintiff's factual allegations in this respect are conclusory and/or conjectural. Moreover, Plaintiff has not alleged facts plausibly suggesting "a sufficiently widespread practice among" CMC employees generally, or at the Jail in particular, to support the conclusion that insufficient screening and supervision of detainees with respect to medical and/or mental health problems was a custom of which CMC supervisory personnel was aware. *See Iacovangelo*, 624 F. App'x at 14 ("Here, although Correctional Medical Care appears to have a troubled track record in many respects, the plaintiff has not pleaded a *custom* of not providing adequate medical supervision for inmates going through drug or alcohol withdrawal.").[21]

---

[20]    "Corporate entities . . . are treated the same as a municipality when performing the public function of running a jail." *Mercado v. City of New York*, 08-CV-2855, 2011 WL 6057839, at *7 n.10 (S.D.N.Y. Dec. 5, 2011) (citations omitted). Thus, CMC "enjoys the benefits of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit." *Cruz v. Corizon Health Inc.*, 13-CV-2563, 2016 WL 4535040, at *8 n.11 (S.D.N.Y. Aug. 29, 2016) (quoting *Bess v. City of New York*, 11-CV-7604, 2013 WL 1164919, at *2 [S.D.N.Y. Mar. 19, 2013]) (concluding that "[t]he analysis under *Monell* . . . applies equally to Corizon," a private entity that "provides medical care in prisons and thus 'performs a role traditionally within the exclusive prerogative of the state'"); *see generally Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses.").

[21]    In *Iacovangelo*, the Second Circuit affirmed that portion of the district court's order dismissing a *Monell* claim similar to that asserted in this case. *See Iacovangelo v. Corr. Med. Care, Inc.*, 13-CV-6466, 2014 WL 4955366, (W.D.N.Y. Oct. 2, 2014), *aff'd in part, vacated in part, and remanded*, *Iacovangelo*, 624 F. App'x at 13-14 ("The Court finds that given the very large number of inmates that CMC employees must have treated over the years on a continuous basis, nine unrelated deaths, five of which were by suicide and one of which was due to an undetermined cause, over the course of several years does not plausibly suggest the existence of a policy of providing sub-standard care in order to save money, such as is alleged

For each of these reasons, as well as those set forth in CMC Defendants' memoranda of law, Plaintiff's deliberate indifference claim is dismissed as to CMC.[22]

### E.    Whether Plaintiff's Wrongful Death Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memoranda of law.[23]  (Dkt. No. 30 at 29-30; Dkt. No. 85 at 14-16.)  The Court would add only two brief points.

---

here."); *see also McNulty v. Yaneka*, 11-CV-8320, 2013 WL 684448, at *9 (S.D.N.Y. Feb. 25, 2013) ("Plaintiff's speculative and conclusory allegations of an unlawful custom or practice are insufficient to support a claim of municipal liability against CMC.  Plaintiff's theory that CMC has a policy of making medical decisions based on cost is based on mere conjecture.  Even accepting as true Plaintiff's allegation that the number of suicides and deprivations of medical treatment has increased since CMC became the medical provider at [Dutchess County Jail], Plaintiff has failed to allege any factual nexus between these incidents and any alleged policy or custom by CMC.").  Even if the handful of other incidents referenced in Plaintiff's Second Amended Complaint were similar to the acts or omissions to which Wilkins was allegedly subjected, Plaintiff has not alleged facts plausibly suggesting (1) that CMC Defendants were found to be liable in some way for those other incidents, or (2) a sufficiently widespread or pervasive custom such that CMC may be held liable for the violation of Wilkins' constitutional rights in this case.  *See, e.g., Walker v. City of New York*, 12-CV-5902, 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014) ("The paltry [ten] complaints (none resulting in an adjudication of liability), spread over [a decade] in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim.").

[22]    To the extent that Plaintiff's reference to Umar, Carpio, and Dr. Valle in the caption of her "Second Cause of Action" reflects her intention to assert § 1983 claims against them in their official capacities (Dkt. No. 75 at 12), those claims must also be dismissed because they are duplicative of her *Monell* claim against CMC.  *Henning*, 2016 WL 297725, at *1; *accord, Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010).

[23]    "Under New York law, as a general matter, the elements of a wrongful-death action are '(1) the death of a human being born alive; (2) a wrongful act, neglect or default of the defendant by which the decedent's death was caused, provided the defendant would have been liable to the deceased had death not ensued; (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent; and (4) the appointment of a personal representative of the decedent."  *Kastle v. Town of Kent, N.Y.*, 13-CV-2256, 2014 WL 1508703, at *14 (S.D.N.Y. Mar. 21, 2014) (citations and internal quotation marks omitted).

First, CMC Defendants do not expressly argue that dismissal is warranted with respect to Plaintiff's wrongful death claim.  (Dkt. No. 16 at 15-16 [CMC Defs.' Memo. of Law, addressing only Plaintiff's claim for conscious pain and suffering and damages for loss of companionship].)[24]

Second, in his reply memorandum of law, Dr. Valle argues that Plaintiff has failed to adequately plead that Dr. Valle's "actions constituted any more than a disagreement in treatment."  (Dkt. No. 87 at 15.)  This argument may prove persuasive based on an evidentiary record on a motion for summary judgment or at trial, because it will be incumbent on Plaintiff to demonstrate either ordinary negligence or medical malpractice on the part of Dr. Valle to support her wrongful death claim.  However, for the same reasons discussed in the context of Plaintiff's deliberate indifference claim, the Court concludes that Plaintiff has adequately pleaded a claim for wrongful death under New York State law.

**F.    Whether Plaintiff's Claim for Conscious Pain and Suffering Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memorandum of law.  (Dkt. No. 30 at 28-30 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.].)

The Court would add only that, although Plaintiff's Second Amended Complaint does not alleged facts revealing the manner in which Wilkins took his own life (a fact which would

---

[24]     To the extent that Defendants may be understood to argue that Plaintiff has not sufficiently identified his distributees, the Court finds this argument unpersuasive at the motion to dismiss stage.  *See, e.g., Melvin v. Cty. of Westchester*, 14-CV-2995, 2016 WL 1254394, at *23 (S.D.N.Y. Mar. 29, 2016) (rejecting argument that allegation that decedent had "at least four children who are his surviving next of kin" was not sufficiently specific to state a wrongful death claim).

presumably be within the knowledge of Defendants) or the nature or length of suffering before his death, at least one New York State court has suggested that damages of conscious pain and suffering may be recoverable on the theory that a defendant's treatment of the decedent's depression prior to suicide exacerbated the condition. *See Stolarski v. Family Servs. of Westchester, Inc.*, 110 A.D.3d 980, 982 (N.Y. App. Div. 2d Dep't 2013) (stating that plaintiff was not precluded from "attempting to prove her entitlement to [conscious pain and suffering] damages on the theory that the decedent's [depression] was exacerbated by Family Services' alleged failure to provide proper treatment" before her suicide).

**G.      Whether Plaintiff's Claim for Damages on Behalf of Wilkins' Children Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's memoranda of law. (Dkt. No. 30 at 29-30 [Plf.'s Opp'n Memo. of Law to CMC Defs.' Mtn.].) Here, because dismissal of Plaintiff's wrongful death claim is unwarranted at this stage, the Court concludes dismissal of her claim for damages on behalf of Wilkins' children is also unwarranted. However, a point of clarification is in order.

Plaintiff's Second Amended Complaint seeks damages for "loss of companionship for the children of Wilkins." (Dkt. No. 75 at ¶ 53.) New York law "steadfastly restrict[s] recovery [in a wrongful death action] to 'pecuniary injuries,' or injuries measurable by money, and denied recovery for grief, loss of society, affection, conjugal fellowship and consortium[.]" *Gonzalez v. New York City Housing Auth.*, 77 N.Y.2d 663, 667-68 (N.Y. 1991). The word "pecuniary is "used in distinction to those injuries to the affections and sentiments which arise from the death of relatives" and "excludes those losses which result from the deprivation of the society and companionship of relatives[.]" *Gonzalez*, 77 N.Y.2d at 667.

CMC Defendants' argument that Wilkins' children are not "automatically" entitled to such damages is well-taken. (Dkt. No. 16 at 14-15 [CMC Defs.' Memo of Law]; Dkt. No. 35 at 13 [CMC Defs.' Reply Memo. of Law].) "[T]he essence of the cause of action for wrongful death . . . is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Gonzalez*, 77 N.Y.2d at 668. "The fact that there are children who are distributees of the estate is not, by itself, sufficient to establish that there was a pecuniary loss." *Melvin*, 2016 WL 1254394, at *23 n.17 (quoting *Pub. Adm'r of Queens Cty. ex rel. Estate & Beneficiaries of Guzman v. City of N.Y.*, 06-CV-7099, 2009 WL 498976, at *12 [S.D.N.Y. Feb. 24, 2009]). Although the Court can (barely) reasonably infer from Plaintiff's Second Amended Complaint a plausible assertion to entitlement to such damages, "going forward, Plaintiff will need to offer proof of pecuniary loss." *Melvin*, 2016 WL 1254394, at *23 n.17.

## H. Whether Plaintiff's Claim for Punitive Damages Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Plaintiff's opposition memoranda of law. (Dkt. No. 30 at 27-28; Dkt. No. 85 at 17-18.) The Court would add only two brief points.

First, "[a] demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Quinn*, 946 F. Supp. 2d at 286 (quoting *Yong Wen Mo v. Gee Ming Chan*, 17 A.D.3d 356, 359 [N.Y. App. Div. 2d Dep't 2005]).

Second, as Defendants correctly note (Dkt. No. 16 at 16 [CMC Defs' Memo. of Law]; Dkt. No. 83, Attach. 3, at 21 [Valle's Memo. of Law]), "[t]o recover punitive damages under § 1983 against a government official in his individual capacity, the Plaintiff must show that the official acted with a malicious or evil intent or in callous disregard of the Plaintiff's federally

protected rights." *Pritchard v. Town of New Hartford*, 14-CV-1477, 2016 WL 4523986, at *4

n.2 (N.D.N.Y. Aug. 22, 2016) (McAvoy, J.) (citing *Smith v. Wade*, 461 U.S. 30 [1983]); *accord,*

*Wilson v. Aquino*, 233 F. App'x 73, 77 (2d Cir. 2007).  Although the Court is skeptical of

Plaintiff's entitlement to punitive damages, under the circumstances, whether the individual

Defendants possessed the requisite "callous disregard" is a question more appropriately

addressed with the benefit of an evidentiary record.

I.      **Whether Dr. Valle's Motion to Dismiss Cross-Claims Interposed by County
        Defendants Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the negative for

the reasons set forth in County Defendants' opposition memorandum of law.  (Dkt. No. 98 at 2-5

[County Defs.' Opp'n Memo of Law to Valle's Mtn. to Dismiss Cross-Claims].)

J.      **Whether Plaintiff Should Be Permitted to Amend Her Second Amended
        Complaint**

As noted above, Plaintiff argues in her opposition memoranda of law (at various points)

that, prior to dismissal of any of her claims, she should be granted leave to amend her Second

Amended Complaint to supplement (again) her factual allegations.  (Dkt. No. 30 at 20, 23, 30;

Dkt. No. 85 at 18-20).  Additionally, in a letter dated September 19, 2016, addressed to United

States Magistrate Judge Daniel J. Stewart, Plaintiff's counsel has requested a motion conference

"to discuss [the] need to amend [Plaintiff's Second Amended] Complaint."  (Dkt. No. 112 at 1.)

More specifically, Plaintiff's counsel asserts that further amplification of Plaintiff's factual

allegations is necessary to address pleading deficiencies upon which Defendants' motions to

dismiss are based.  (*Id.*)  In conjunction with this request (which, Plaintiff's counsel notes,

Defendants oppose), Plaintiff's counsel also requests that "a decision on Defendants' [m]otion[s]

to [d]ismiss be held in abeyance" until the Court determines whether Plaintiff should again be

permitted to amend her Second Amended Complaint.  (*Id.* at 2.)

First, with regard to Plaintiff's alternative requests to amend in her opposition memoranda of law, "numerous courts have held that a 'bare request to amend a pleading' contained in a brief, which does not also attach the proposed amended pleading, is improper under Fed. R. Civ. P. 15." *Garnett-Bishop v. N.Y. Cmty. Bancorp, Inc.*, 12-CV-2285, 2014 WL 5822628, at *5 (E.D.N.Y. Nov. 6, 2014) (collecting cases); *see also Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint."); *Matthew v. Corning Inc.*, 77 F. Supp. 3d 275, 301 (W.D.N.Y. 2014). Moreover, Local Rule 7.1(a)(4) of the Court's Local Rules of Practice requires that a party seeking leave to amend a pleading must "attach an unsigned copy of the proposed amended pleading to its motion papers," and "set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." N.D.N.Y. L.R. 7.1(a)(4). Plaintiff has not done this.

Alternatively, Plaintiff has not shown cause for her request. Specifically, Plaintiff has not shown why she could not have, through the exercise of due diligence, obtained the "new" evidence on which she relies before she filed her Second Amended Complaint. Nor has she shown the lack of undue prejudice to Defendants if the amendment is allowed.

Finally, Plaintiff's September 19, 2016, letter request–which was addressed to Magistrate Judge Stewart and seeks to hold the decision of this Court on Defendants' motions to dismiss in abeyance–is both completely without legal basis and in contravention of the Court's Local Rules of Practice. CMC Defendants' motion to dismiss was filed in December 2015, and at no point in the nine-plus months since that time (or, indeed, since this case was filed) have the parties consented to Magistrate Judge Stewart exercising jurisdiction over, *inter alia*, the handling and

determination of the parties' dispositive motions. *See* N.D.N.Y. L.R. 72.2(b), 72.3(b); 28 U.S.C. § 636(c).

For each of these reasons, Plaintiff's improperly interposed request to amend her Second Amended Complaint is denied.

**ACCORDINGLY,** it is

**ORDERED** that CMC Defendants' motion to dismiss Plaintiff's Second Amended Complaint (Dkt. No. 16) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Dr. Valle's motion to dismiss Plaintiff's Second Amended Complaint (Dkt. No. 83) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Dr. Valle's motion to dismiss cross-claims interposed by Defendants Schenectady County, D'Agostino, and Barrett (Dkt. No. 97) is **DENIED**; and it is further

**ORDERED** that Plaintiff's First Cause of Action (asserting a claim of deliberate indifference to decedent's serious medical needs, in violation of the Eighth Amendment of the United States Constitution) is **DISMISSED** with respect to only Defendants Umar and Carpio in their personal capacities; and it is further

**ORDERED** that Plaintiff's Second Cause of Action (asserting municipal liability and official capacity claims for the violations asserted in Plaintiff's First Cause of Action) is **DISMISSED** with respect to Defendants CMC, Umar, Carpio, and Dr. Valle; and it is further

**ORDERED** that surviving Defendants' motions are the following claims:

(1) Plaintiff's First Cause of Action with respect to Defendants Morgan, Dr. Valle, D'Agostino, and Barrett in their personal capacities;

(2) Plaintiff's Second Cause of Action with respect to Defendants Schenectady County and Defendants D'Agostino and Barrett in their official capacities;

(3) Plaintiff's Third Cause of Action with respect to all Defendants;

(4) Plaintiff's Fourth Cause of Action with respect to all Defendants;

(5) all claims with respect to John Does No. 4 and 5 and Jane Doe No. 1; and

(6) all cross-claims that have been interposed in this action; and it is further

**ORDERED** that Plaintiff's letter request (Dkt. No. 112) to amend her Second Amended Complaint is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendants file an answer to the Plaintiff's Second Amended Complaint within 14 days of the date of this Decision & Order pursuant to Fed.R.Civ.P. Rule 12(a)(4)(a).

Dated: September 26, 2016
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge